UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------------x

ROBIN STACY STUART,

                            **MEMORANDUM & ORDER**

               Plaintiff,

      -against-                      13-CV-04552 (SLT)

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL SECURITY

                        Defendant.

----------------------------------------------------------------------------x

**TOWNES, United States District Judge:**

       Robin Stacy Stuart ("Plaintiff") seeks reversal of a final judgment issued by Acting

Commissioner of Social Security, Carolyn W. Colvin (the Commissioner), which affirmed

Administrative Law Judge ("ALJ") Hilton R. Miller's unfavorable decision that Plaintiff is not

disabled within the meaning of the Social Security Act (the "Act"). Social Security Act, 42

U.S.C. § 423 *et. seq*. (2004). Plaintiff asserts that she is disabled under section 1614(a)(3)(A) of

the Act, claiming she suffers from depression, anxiety, bladder problems, chronic pain

syndrome, asthma, and interstitial cystitis. (R. 47.) Upon review of the evidentiary record, the

ALJ determined that Plaintiff failed to meet the criteria under the Act to qualify as disabled when

she filed for Supplemental Security Income ("SSI") benefits. (R. 19.) Specifically, the ALJ

concluded that Plaintiff maintained a residual functional capacity ("RFC") for "medium" or

"light" work, comparable to that of a bagger, hand packer, final assembler, hand trimmer, or

cafeteria assistant, and thus has the functional capacity to participate in specific areas of the

national workforce. (*Id*.) Currently before the Court are the parties' cross-motions for judgment

on the pleadings.  (Dkt. Nos. 18, 20.) Counsel for Plaintiff challenges the ALJ's decision on the

following grounds that the ALJ (1) failed to follow the treating physician rule; (2) failed to

properly evaluate plaintiff's credibility; and (3) relied on flawed vocational expert ("VE")

testimony. (Pl. Mem. 11-21.) The Commissioner asserts that the decision finding Plaintiff disabled is correct and should be affirmed.  For the following reasons, the Court grants Plaintiff's motion for judgment on the pleadings to the extent that it seeks remand, denies the Commissioner's motion for judgment on the pleadings, reverses the Commissioner's decision, and remands the action for further proceedings consistent with this opinion.

## I.    BACKGROUND

### Procedural History

On May 4, 2010, Plaintiff filed an application for SSI benefits, asserting that her disability began on January 1, 1998. (R. 12, 90.) Her claim was initially denied on September 20, 2010, and was again denied upon reconsideration the following day. (R. 12.) On November 19, 2010, Plaintiff submitted a written request for a hearing before an ALJ. (*Id*.) A video hearing was held on October 12, 2011; ALJ Miller presided in New York, New York, while Plaintiff appeared in Staten Island, New York. (*Id*.) Edna F. Clark, an impartial Vocational Expert ("VE"), was also present at the hearing. (*Id*.)

On October 26, 2011, the ALJ determined that Plaintiff was not disabled, and thereby could not receive SSI benefits. (R. 7.) On December 16, 2011, Plaintiff requested review of the ALJ's decision by the Appeals Council. (R. 7-8.) The Appeals Council ultimately denied the request for review on June 18, 2013. (R. 1.)

On August 13, 2013, Plaintiff commenced this action.  On March 17, 2014, counsel for Plaintiff filed a Motion for Judgment on the Pleadings. (Dkt 18.) Defendant's counsel opposed the Motion on April 16, 2014 and filed a Cross-Motion for Judgment on the Pleadings. (Dkt. 20.)

**Factual Background**

### A. Age, Education, Work, and Family Background

Plaintiff was born on March 28, 1972, and was 38-years-old at the time she filed for SSI benefits. (R. 90.) Plaintiff has a high school diploma and has not completed any subsequent job training or advanced schooling. (R. 114.) She has a very limited employment history because she stopped working to raise her four children. (R. 113.)

At the time of the hearing, Plaintiff had custody of her sixteen-year-old daughter, while her three sons lived with their father. (R. 29-33.) Following the birth of her youngest son in 2007, Plaintiff claims she was disabled completely. (*Id.*) According to Plaintiff, a state court removed her three youngest children from her care "because of [her] illness and [the court] didn't think [she] was able to take care of the children because of the state [she] was in." (*Id.*) According to an Intake Assessment prepared by the Jewish Board of Family and Children's Services, Inc. ("JBFCS"), the New York City Administration for Children's Services ("ACS") referred Plaintiff to JBFCS for mental health treatment after Plaintiff's children were removed from her care by ACS based on allegations of neglect. (R. 605.) The JBFCS report states that Plaintiff is "often tearful and has difficulty falling asleep" and "has trouble controlling her worries since her children were moved by ACS in March 2009." (*Id.*)

### B. Health Background

#### 1. General Health and Lifestyle

Plaintiff claims that she has had fibromyalgia since 1995 and has had recurring pain in her toe, ankle, knee, hip, and neck joints, as well as her jaw and fingers. (R. 31-32.) Plaintiff reported that the pain is persistent and, depending on her stress level, can trigger her bipolar disorder. (*Id.*) She testified that she has been treated for bipolar disorder since 1995 and that she can "get angry really, really, really quickly and it stays and it's a rage." (R. 33.) Once her anger

intensifies, Plaintiff said that she "will sit there and [she] will cry, and cry, and cry and feel hopeless." (*Id*.) Plaintiff also testified that she has general anxiety and suffers from frequent cluster migraines. (R. 35.)

Plaintiff completed a function report on June 10, 2010 prior to her hearing. (R. 129-47.) She reported that she relies on her daughter and parents for assistance with general housekeeping tasks like cooking and laundry. (R. 130-31.) Plaintiff does very little driving and feels more comfortable when someone else is driving. (R. 132.) She finds showering painful. (R. 130.) She stated that her pain first began in October 2007 and felt as though she was "on fire from head to toe." (R. 137.) Plaintiff took medications including Fentanyl, Roxicodone, and Flexeril, and while they did not fully alleviate the pain, they "made it so [she] can live." (R. 138.) Furthermore, she stated that she needs a lot of sleep and that her pain is exacerbated when she performs more daily activities. (R. 130.) While her physical activities are limited, Plaintiff regularly reads, watches television, talks on the phone, and uses the computer. (R. 133-34.)

### 2. Specialists and Diagnoses

#### a. Primary Care Physician—Vincent P. DeGennaro, M.D.

Plaintiff's primary care physician is Dr. Vincent P. DeGennaro. (R. 249.) She has been under his care since 1995. (R. 249, 745.) In a June 3, 2010 letter, DeGennaro stated: "She is being treated for Epstein Barr Virus, Grave's Disease, Fibromyalgia, Chronic Pain Syndrome, Ankle and Foot Joint Pain, Brachial Radiculitis, Facial Pain, Temporomandibular Joint Syndrome, Thoracic Spine Pain, Chronic Urinary Burning/Pain, Chronic Interstitial Cystitis, Asthma, Migraine, Hyperthyroidism, Hyperlipidemia, Anxiety, and Depression." (*Id*.) Additionally, DeGennaro noted: "Her multiple conditions are being treated by the following Specialists: Cardiologist, Dermatologist, Endocrinologist, Gastroenterologist, Infectious Disease,

Neurologist, Otorhinolayngologist, Pain Management, Psychiatrist, Rheumatologist, and Urologist." (*Id.*)

In an October 4, 2010 letter, DeGennaro opined that Plaintiff's medical problems would "make it difficult for her to work"; he stated that he could not comment on her ability to work from a psychiatric standpoint and "this would have to come directly from the Psychiatrist who treats her." (R. 745, 764, 804.) However, in his Treating Physician's Wellness Plan Report, also dated October 4, 2010, DeGennaro indicated that due to chronic pain and severe fatigue, Plaintiff would be unable to work for at least twelve months. (R. 746.)

On September 23, 2011, DeGennaro filled out a Multiple Impairment Questionnaire in which he diagnosed Plaintiff as suffering from: (1) chronic fatigue syndrome, (2) chronic urinary tract infections, (3) hyperthyroidism (Grave's disease), (4) depression, (5) fibromyalgia, and (6) asthma. (R. 807.) The form is incomplete, as some questions are unanswered and many that require additional supporting evidence are left blank. (R. 808, 812, 813.) DeGennaro also estimated that if Plaintiff was placed in a competitive five-day-a-week work environment on a sustained basis, in an eight-hour day, she could sit for two hours and stand/walk for one hour. (R. 809.) Furthermore, he answered 'yes' to the question: "Would it be necessary or medically recommended for your patient not to sit continuously in a work setting?" (*Id.*) He estimated that Plaintiff would have to change positions every two hours and would need 30 minutes until she could sit again. (R. 809-10.) Also, he opined that it would be necessary or medically recommended for Plaintiff not to stand/walk continuously in a work setting. (R. 812.) In addition, he answered that she could occasionally lift and carry 0-5 pounds. (*Id.*) DeGennaro indicated that Plaintiff is incapable of tolerating even low work stress and checked "no pushing," "no pulling," "no kneeling," "no bending," and "no stooping" as work restrictions. (R. 813.)

### 3.    Pain Management—Glenn D. Babus, D.O.

Plaintiff began seeing Dr. Glenn D. Babus, a pain management specialist, on February 12, 2007. (R. 384-86.) Babus's reports indicate that Plaintiff experienced pain in her joints, muscles, neck, shoulder, back, and knee. (*Id*.) The most severe pain was in her neck, shoulders, and upper back. (*Id*.) She described the pain as "achy," "exhausting," "sharp," "shooting," "miserable," "throbbing," "numb," "tender," "stabbing," and "unbearable." (R. 388.) She could not walk for long periods of time and was taking medications for pain relief (Vicodin, Norflex, Aleve, and Advil). (R. 384.) Plaintiff had used Skelaxin, Flexeril, Cymbalta, Ultracet, and Lidoderm in the past. (*Id*.) Additionally, Plaintiff had tried hypnosis, TENS unit, heat therapy, and bed rest. (*Id*.) At the time of the consult, she had completed ten months of physical therapy and reported that swimming gave her 20-30% relief. (*Id*.) Babus also noted that Plaintiff's "pain has increased" and "things that make it worse are sitting, standing, walking, physical activity, and lying down." (*Id*.)

During his initial physical examination, Babus noted that Plaintiff was alert, well-groomed, and had no pain with good ranges of motion in her shoulders, elbows, and fingers. (R. 385.) However, her cervical spine had multiple points of tenderness and there were "multiple trigger points and pain noted throughout thoracic spine." (*Id*.) Ultimately Babus diagnosed Plaintiff with myofascial pain syndrome and cervical radiculopathy. (R. 384-85.) Babus noted that he would try using a trigger point method and get an MRI test done on Plaintiff's cervical spine during future consults. (*Id*.) However, he was uncomfortable prescribing any new medication to Plaintiff because she was trying to get pregnant around this time. (R. 385.) Overall, his plan was to have Plaintiff alter her exercise regimen by spending more time

swimming and to have her "start walking five minutes in the morning, five minutes at lunch and five minutes at night and increase gradually." (*Id*.)

Plaintiff returned to see Babus on February 28, 2007. Her diagnoses remained the same. Babus administered trigger point injections. (R. 374.) These injections provided Plaintiff with pain relief for two weeks at a time. (R. 366.) On April 11, 2007, Plaintiff returned pregnant and complained of temporomandibular joint ("TMJ") pain. (R. 370.) Because of her pregnancy, a cervical MRI could not be conducted. (*Id*.) Babus administered a TMJ injection, which did not provide Plaintiff with any sort of relief. (R. 370, 366.) Plaintiff gave birth on October 21, 2007, and returned to Babus' office on November 14, 2007. (R. 363, 366.) She complained of pain in the back of her head, TMJ, shoulders, and hips. (*Id*.) Upon physical examination, Babus' assessment was occipital neuralgia, hip arthropathy, sacroiliac arthropathy, myofascial pain, and TMJ. (*Id*.) Babus planned to do another series of trigger point injections. (*Id*.)

Plaintiff continued to see either Babus or his physician's assistants on a monthly basis throughout 2008, 2009, and 2010. (*See* R. 320-60) While there was no appreciable change in her pain or symptoms, Babus or his assistants periodically changed Plaintiff's medication regimen. (*Id*.) On July 14, 2008, Babus' assistant Marissa Maurino, MS, PA-C prescribed Duragesic patches stating, "She does not need any other medications at this time." The following month, Plaintiff stated that the patches provided 60-70% relief, but were not as effective as the previous month. (R. 345-46.)

Plaintiff complained in November and December 2009 of muscle spasms. (R. 325-26.) Her EMG came back normal. (R. 325.) In early 2010, Plaintiff saw Babus' physician's assistant, Bridgit Farrell. (R. 323-25.) Plaintiff's diagnoses remained unchanged. (*Id*.) Throughout much of 2010, Plaintiff's pain vacillated in intensity. (R. 320-25) On May 18, 2010, Babus composed a

letter stating: "Ms. Stuart is currently treated in our Pain Management office for chronic pain syndrome, myofascial pain, and fibromyalgia." (R. 252.) On September 8, 2010, Babus wrote another letter stating: "We continue to see her for Chronic pain syndrome, myofascial pain, and fibromyalgia. Due to her pain complaints, she is unable to work for the remainder of this year." (R. 697.) In March, May, and July 2011, Plaintiff went to Babus' office. (R. 791-96) Notes from those visits indicate that Plaintiff "continue[d] to suffer from chronic pain secondary to fibromyalgia with a large myofascial component." (*Id*.) However, Babus' office was limited in its ability to provide pain relief because Plaintiff's medical insurance was not accepted. (R. 791.)

### 4. Urology—Nachum M. Katlowitz, M.D. & Abraham Ostad, M.D.

Plaintiff first saw urologist Dr. Nachum M. Katlowitz on December 26, 2007. (R. 704.) She reported that she has had persistent urinary tract infections since she was eight years old. (*Id*.) Two years prior to this consult, she was advised by her gynecologist to see a urologist, but she failed to see one. (*Id*.) She reported to Katlowitz that she was experiencing pain in her bladder and lower back. (*Id*.) Katlowitz reported that Plaintiff seemed angry during exam and "whenever she did not like the direction of his questions, [he] could see her face tense." (R. 705.) Katlowitz noted that although Plaintiff's abdomen was obese, there were no signs of SI joint or spinal tenderness. (*Id*.) Her deep tendon reflexes were also normal. (*Id*.) Katlowitz's report states: "A lot of this does not make sense. She has had such severe pain for so many years and I am the first urologist she has seen (???). Either she has a high pain threshold or *memory* is not the same as *history*." (*Id*.) (emphasis in original).

Plaintiff returned on January 15, 2008 and physical examination revealed that she had a pelvic floor spasm. (R. 569.) Katlowitz was able to release the spasm on the left side, which reduced the pain, but the right side remained tense. (*Id*.) Katlowitz believed there was a

connection between the spasm and Plaintiff's lower urinary tract symptoms. (*Id.*) Thereafter, he recommended that she see a neurologist. (*Id.*) He also noted that traces of stress-induced muscle spasm with regard to her TMJ were present and he consequently suggested appropriate stress management tactics. (R. 570.)

Plaintiff returned to Katlowitz's office in August 2010 after seeing another urologist, Dr. Abraham Ostad, for two years. (R. 701.) Ostad stated, in an August 10, 2010 report, that Plaintiff was "[p]hysically, ambulatory … [h]owever, emotionally stable with bipolar," observed that Plaintiff was "[s]eparated from her husband and her children," and concluded "as far as any disability, my advise [*sic*] would be to refer to her psychiatrist for appropriate decision." (R. 604.)

On her August 25, 2010 visit, she complained of excruciating pain. (R. 700.) Katlowitz reviewed the tests that had been performed at Ostad's office and was skeptical of Ostad's diagnosis of urethral stenosis. (*Id.*) Plaintiff's CAT scan, performed two months prior indicated common bile duct dilatation and a simple left renal cyst. (*Id.*) On September 7, 2010, a cystoscopy was performed that yielded findings that were consistent but not diagnostic of interstitial cystitis. (R. 698.) The following week, Plaintiff returned and expressed that she was having trouble urinating and experiencing heightened pain in her urethra. (R. 699) Katlowitz recommended DMSO treatment, however, because Plaintiff failed to contact the appropriate agency, she did not get the treatment. (*See id.*)

### 5. Psychology & Psychiatry—Santapuri Rao, M.D., Dana Jackson, Psy. D, & J. Kessel, M.D.

Plaintiff began seeing Dr. Santapuri Rao, a psychiatrist, on April 28, 2009. (R. 821.) Rao reported that Plaintiff was cooperative and coherent with no memory problems. (R. 782.) Her mood was "okay," insight and judgment were fair, and she had no suicidal or homicidal

thoughts. (*Id.*) However, she continued to express frustration and sadness regarding the removal of her children from her care. (*Id.*) Plaintiff continued to see Rao monthly between April 2009 and July 2011. (R. 782-88.) On his Psychiatric/Psychological Questionnaire dated, October 4, 2011, Rao diagnosed depressive disorder NOS, adjustment disorder with depressed mood, and ruled out bipolar disorder. (R. 748.) He also marked the check-box that patient was unable to work for at least twelve months. (R. 749.) Furthermore, he noted that Plaintiff was on average, moderately or markedly limited with respect to understanding and memory, sustained concentration and persistence, social interactions, and adaptations. (R. 822-26.) He ultimately allocated a Global Assessment of Functioning (GAF) score of 60-65 to Plaintiff.[1] (R. 821.) Rao noted that Plaintiff's psychiatric condition increased pain that was related to her fibromyalgia condition. (R. 827.) In addition, Rao mentioned that Plaintiff could tolerate a low level of work stress, yet on average would likely be absent from work as a result of her impairments or treatment more than three times a month. (R. 828.)

On August 27, 2010, Plaintiff met with Dana Jackson, Psy. D, for a consultative examination. (R. 712.) Jackson found that Plaintiff was cooperative during questioning. (R. 713.) Jackson observed that Plaintiff "exhibited no speech deviations. Plaintiff exhibited no thought process disorder." (*Id.*) Jackson noted that patient had been psychiatrically hospitalized twice and both were the results of suicidal thoughts and plans. (R. 712-13.) Jackson opined that Plaintiff exhibited below average intellectual skills, had "good remote memory function," and that "her attention and concentration were within normal limits." (R. 714.) Jackson recorded that Plaintiff

---

[1] "The GAF is a scale promulgated by the American Psychiatric Association to assist "in tracking the clinical progress of individuals [with psychological problems] in global terms."" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders ("DSM")* 32 (4th ed. 2000)). A GAF score of 61-70 demonstrates some mild symptoms or some difficulty in occupational, social, or school functioning. *DSM* at 34. However, a GAF in this range means an individual can generally function pretty well and can have some meaningful interpersonal relationships. *Id.*

was able to cook, clean, shop, drive, and manage her bank account, despite receiving some assistance from her father with these tasks. (R. 714-15.) Also, Jackson opined that "her depressive symptoms appear to be of a moderate nature at this time. Her ability to interact with others in a social situation does appear to be intact." (R. 715.) Jackson also suggested that Plaintiff should continue to take medications like Trazodone, Cymbalta, and Klonopin to address her psychiatric symptoms and could benefit from some form of talk therapy. (*Id.*)

On September 15, 2010, state agency review psychiatrist Dr. J. Kessel completed the Psychiatric Review Technique form. (R. 717-30.) He concluded that Plaintiff's "Medical Disposition" was based on Section 12.04 "Affective Disorders." (R. 717.) He noted that Plaintiff exhibited depressive syndrome, which was characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and thoughts of suicide. (R. 720.) Moreover, he recorded that Plaintiff was not significantly limited or moderately limited with regard to understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (R. 731-32.) Furthermore, he noted: "Clt can understand, remember, and carry out simple instructions. She can concentrate for extended periods of time. She can relate appropriately to coworkers and supervisors. She can adapt adequately to changes in the work-environment." (R. 733.) Kessel found that Plaintiff's impairment was more aligned with paragraph "B" criteria and did not place her within paragraph "C" criteria of 12.04 "Affective Disorders." (R. 728.)  In addition, it was noted on the Electronic Request for Medical Advice for the New York State Office of Temporary and Disability Assistance, "I FEEL THAT THE CLAIMANT'S MAJOR PROBLEM AT THE PRESENT TIME IS HER FIBROMYALGIA. HER DEPRESSION APPEARS TO BE OF MODERATE

INTENSITY. I THINK THAT SHE SHOULD BE A PSYCH DENIAL." (R. 735.) (emphasis in original). Kessel reviewed the form and provided his signature. (*Id*.)

### 6. Neurology—Stephen A. Kulick, M.D.

On December 4, 2007, Plaintiff saw Dr. Stephen A. Kulick, a neurologist, and reported migraine headaches and weakness in her legs. (R. 363.) She reported that "sometimes she cannot get up from the floor and she has to have her husband help her up." (*Id*.) He started her on Topamax and ordered EMG and MRI testing to be performed. (*Id*.)

On May 22, 2008, Kulick reported, "The patient's EMG and nerve conduction velocities were normal, so is her cervical MRI. We still do not have an explanation for why she has profound weakness, walking around like an old lady in pain dragging her limbs." (R. 552.) He prescribed Pamelor and Imitrex for Plaintiff's constant headaches and advised her to stop using Topamax. (*Id*.)

On June 5, 2008, Plaintiff had another MRI performed on her lumbosacral region, which came back normal. (R. 562.) Plaintiff returned on November 10, 2008, and complained of three episodes of "total body pain with burning sensations everywhere." (R. 564.) She had a negative reaction to the Imitrex, so resumed the use of Topamax. (*Id*.) Furthermore, Kulick noted, "I am not sure what these total body pain episodes are. So far, all the MRIs that we have done have been normal as has the EMG and I do not believe these are neurological episodes." (*Id*.)

### 7. SSA Consultative Examiner—Chitoor Govindaraj, M.D.

Plaintiff was examined by Dr. Chitoor Govindaraj on September 14, 2010. (R. 737-40.) He noted that Plaintiff's range of motion was within normal limits for her neck and spine. (*Id*.) When he evaluated her spine, he recorded that she was able to bend down and touch the floor. (*Id*.) He also noted that "Motor system and sensory system exams are all normal. Range of

motion of the back and joints normal. Hand dexterity is normal. No evidence of muscle spasm. Straight leg raising test is normal." (*Id*.) Govindaraj stated Plaintiff was "cleared for occupation" and that "overall medical prognosis is good." (*Id*.)

### 8. Vocational Expert Testimony

The VE, Edna Clark, testified at the hearing held on October 12, 2011 regarding the RFC of a hypothetical individual with the same age, education, and work experience as Plaintiff. (R. 37-40). According to Clark, there are jobs available in the national economy for an individual that: (1) has the RFC to lift and/or carry up to 50 pounds occasionally, 25 pounds frequently, (2) can stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (3) can sit with normal breaks for a total of about six hours in an eight-hour workday, (4) can occasionally climb ramps and stairs, but not ladders, ropes, or scaffolds, (5) can occasionally balance and stoop, (6) can frequently kneel, crouch, and crawl, (7) does not use or involve hazardous machinery or at unprotected heights, and (8) can perform work that is simple, routine, and repetitive. (*Id*.) For this hypothetical individual, at the medium level, this individual could work as a bagger or a hand packer. (*Id*.) Furthermore, an individual at the light level could work as a final assembler, hand trimmer, or cafeteria assistant. (*Id*.)

Next, the VE testified that for an individual the same age, education, and work experience as Plaintiff, who (1) could only sit for two hours in an eight-hour workday, (2) could stand and walk for one hour, (3) goes off task ten percent of the day due to headaches and psychological limitations, (4) could lift and carry no more than five pounds, and (5) would need at least five to ten bathroom breaks (of five minutes each) throughout the day, cannot perform any work in the national or local economy. (*Id*.)

## II.    DISCUSSION

**Standard of Review**

When reviewing a decision of the Commissioner affirming an ALJ's denial of a claim, this Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause of rehearing." 42 U.S.C. § 405(g) (2010). The Court can set aside the ALJ's decision only in instances "'where it is based upon legal error or is not supported by substantial evidence.'" *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).

To receive federal disability benefits, an applicant must be considered "disabled" in accordance with the requirements of the Social Security Act. 42 U.S.C. § 423(a); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). "Disability" within the context of the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). There is a sequential evaluation process that must be followed to determine if a claimant is disabled. 20 C.F.R. § 416.920(a)(4) (2012).

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed

impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir. 1999) (citing *Balsamo*, 142 F.3d at 79-80.); 20 C.F.R. § 416.920(a)(4)(i)-(v).

Upon consideration of the entire record, this Court determines that the ALJ correctly found that Plaintiff was not engaged in substantial gainful activity at the time she filed for SSI benefits on May 4, 2010 or anytime thereafter. (R. 14.) Plaintiff has not been employed in the national workforce since 1995, when her first child was born. (*See* R. 31.) The ALJ also found that Plaintiff suffered from the following severe impairments: fibromyalgia, bladder disorder, and affective disorder. (R. 14.) However the ALJ decided that "the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*) The ALJ considered Listing 12.04 for Affective Disorders and found that Plaintiff has mild restrictions and difficulties with respect to her social functioning and daily living activities (R. 15.) In addition, he concluded that Plaintiff has moderate difficulties with regard to concentration, persistence, or pace. (*Id.*) However, he determined that paragraph "B" and paragraph "C" criteria of 12.04 were not satisfied. (*Id.*)

He ultimately found that the "claimant has the residual functional capacity to perform medium work." (R. 16.) She is "restricted to lifting 25 pounds frequently and 50 pounds occasionally, sitting, standing or walking for 6-hours in an 8-hour day, and occasionally balancing, stooping, or climbing stairs." (*Id.*) She is barred from using heavy machinery,

climbing ladders or scaffolds, and working at unprotected heights. (*Id*.) Finally, the ALJ noted that Plaintiff is restricted to performing "simple, routine, and repetitive tasks." (*Id*.)

**Treating Physician Rule**

Plaintiff asserts that the ALJ improperly applied the "treating physician rule" and incorrectly weighed the medical evidence of various medical professionals. (Pl. Mem. 11-17.) The Commissioner contends that the ALJ's decision was correct because the lack of appropriate medical evidence and diagnostic tests could discredit DeGennaro's "extreme opinion" regarding Plaintiff's alleged physical impairments. (Def. Mem. 30-38.)

Generally, more weight will be given to the opinion of a source who has examined a claimant than one who has not. 20 C.F.R. § 404.1527(c)(1) (2012). A treating source can be described as a person's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id*. § 404.1502 (2011); *Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011). A mere statement by a medical source that states that the claimant is "disabled" or "unable to work" is not determinative of a claimant's disability status. 20 C.F.R. § 404.1527(d)(1); *see Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *Bynum v. Astrue*, No. 11-CV-5111 (FB), 2013 WL 1873286, at *2 (E.D.N.Y. May 3, 2013). However, a treating physician's opinion will be given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2).

When a treating physician's opinion is not given controlling weight, various factors including (1) the length of the treatment relationship and frequency of examination, (2) nature

and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other relevant factors are taken into consideration to give that medical opinion appropriate weight. *Id.* § 404.1527(c)(2)-(6); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *see also Shaw*, 221 F.3d at 134. The ALJ will initially evaluate the entire medical record, including a claimant's RFC and any appropriate vocational factors, but the Commissioner has "the final responsibility for deciding these issues." 20 C.F.R. § 404.1527(d)(2).

Courts have recognized that certain disabling impairments, such as fibromyalgia, cannot necessarily be diagnosed and conclusively confirmed through objective medical testing. *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003); *Jackson v. Astrue*, No. 09-CV-1290 (FB), 2010 WL 3777732, at *4 (E.D.N.Y. Sept. 21, 2010). In *Green-Younger*, the ALJ "required 'objective' evidence for a disease [fibromyalgia] that eludes such measurement." *Green-Younger*, 335 F.3d at 108. The Second Circuit held that "the ALJ erred by failing to give controlling weight to the treating physician's opinion and effectively requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines." *Id.* at 106; *Newsome v. Astrue*, 817 F. Supp. 2d 111, 128 (E.D.N.Y. 2011) (holding that the ALJ erred by discounting a treating physician's opinion because it was not based on laboratory results even though the impairment could not conclusively be diagnosed through such results). "Fibromyalgia is a unique disease and courts have found error when an ALJ 'did not actually credit [the treating physician's] diagnosis of fibromyalgia or misunderstood its nature….'" *Bailey*, 815 F. Supp. 2d at 598 (quoting *Green-Younger*, 335 F.3d at 108.).

That said, "'[m]ere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability.'" *Prince v. Astrue*, 514 F.

App'x 18, 20 (2d Cir. 2013) (quoting *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008)).

Rather, there must also be evidence of the severity of the plaintiff's symptoms and limitations.

*Id.* For example, in *Jackson*, the plaintiff alleged that muscle weakness, severe joint stiffness,

and severe pain stemming from her prior diagnoses of fibromyalgia rendered her disabled.

*Jackson*, 2010 WL 3777732, at *1. The District Court for the Eastern District of New York held

that "it was improper for the ALJ to conclude that there was no evidence that Jackson's

fibromyalgia was disabling. . . ." *Id.* at *4. The court explained that a physician's long history as

the patient's treating physician and his familiarity with her musculoskeletal condition provided

the "detailed longitudinal picture of her impairments at the heart of the treating physician rule."

*Id.* at *5; *see* 20 C.F.R. § 404.1527(d)(2).

Here, the ALJ concluded that with respect to Plaintiff's physical impairments, the

medical opinions of DeGennaro and Babus should be accorded little weight. (R. 17.) The ALJ

reasoned that their narrative one-paragraph letters excusing Plaintiff from work for the remainder

of 2010 lacked objective medical evidentiary support, but were instead based largely on

Plaintiff's subjective allegations. (*Id.*) The administrative record demonstrates that Plaintiff had

been seeing DeGennaro regularly since 1995 and had been seeing Babus frequently since 2007.

(R. 31-32, 320-84, 745.) Conversely, the ALJ accorded substantial weight to the medical opinion

of Govindaraj based on a single consultative physical examination on September 14, 2010. (R.

17, 737-40.) Additionally, the ALJ noted that "Dr. Govindaraj's opinion is based on live

examination of the claimant … and demonstrates a familiarity with the claimant's medical

history." (R. 17.) The ALJ emphasized Govindaraj's note that Plaintiff's overall prognosis was

"good" and that she was "stable" and "medically cleared for work," yet ignores Govindaraj's

notation that Plaintiff would "require follow-up treatment to manage *her history of body pain and depression*." (*Id.*) (emphasis added).

The ALJ failed to acknowledge the considerable duration of Plaintiff's treating relationship with DeGennaro and Babus. (R. 14.) As mentioned earlier, Plaintiff had been under the care of DeGennaro and Babus for fifteen years and three years, respectively, at the time she filed for SSI benefits. (R. 249, 320-60, 745.) These treating relationships were far more comprehensive than that of Govindaraj, and allowed the treating physicians to develop a "detailed longitudinal picture" of Plaintiff's medical history and impairments that were more extensive than the "snapshot" exam that Govindaraj conducted. (R. 730-40, 745.)

The ALJ also erroneously concluded that DeGennaro and Babus "fail[ed] to cite objective medical evidence" to confirm the diagnosis of fibromyalgia. (R. 17, 252, 320-80, 14.) As explained above, fibromyalgia is not the kind of condition that can necessarily be diagnosed through such evidence. *Green-Younger*, 335 F.3d at 108. Moreover, a treating physician's "failure to include this type of support for the findings in his report does not mean that such support does not exist." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

Finally, the ALJ erred in disregarding the fact that Babus is a specialist in pain management, and is thus better equipped to assess Plaintiff's pain than Govindaraj, a consultative examiner who evaluated Plaintiff on only one occasion. (R. 730-40.); *Petrie v. Astrue*, 412 F. App'x. 401, 407 (2d Cir. 2011) ("The opinion of a specialist regarding medical issues related to his or her area of specialty must be given more weight than the opinion of a source who is not a specialist."); 20 C.F.R. § 404.1527(d)(5). Thus, barring other reasons, his medical opinion as a pain management specialist should have outweighed that of Govindaraj.

The ALJ used a similar line of reasoning when evaluating Plaintiff's mental impairment. He accorded little weight to the opinion of Rao, despite the fact that he was a treating psychiatrist who saw Plaintiff on a monthly basis between April 2009 and July 2011. (R. 14, 782-88.); *see Khan v. Astrue*, No. 11-CV-5118 (MKB), 2013 WL 3938242, at *18 (E.D.N.Y. July 30, 2013) (showing that monthly meetings between a patient and a physician is sufficient to establish that physician as a treating physician); *Newsome*, 817 F. Supp. 2d at 129 (reasoning that a patient meeting with a physician four times was sufficient to establish a treating relationship). The ALJ reasoned that Rao "failed to provide a clear basis for his medical opinion" and that this opinion was "in contrast to the detailed reports of Ms. Jackson and Kessel, which were provided in narrative form." (R. 18.) However, Jackson examined Plaintiff only one time in August 2010 and Kessel never examined Plaintiff. (R. 712-15, 717-36.); *see Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir. 1986) ("[O]pinions of nonexamining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians.").

The United States Court of Appeals for the Second Circuit has cautioned that "ALJs should not rely heavily on the findings of a consultative physician after a single examination." *Selian v. Astrue,* 708 F.3d 409, 419-22 (2d Cir. 2013) (finding that the ALJ improperly accorded heavy weight to a one-time consultative examiner despite the fact that his opinion was "remarkably vague"). The opinion of a consultative physician that examined the patient only one time should certainly not be given weight equal to the opinion of a plaintiff's treating psychotherapist. *Khan*, 2013 WL 3938242, at *17; *Harris v. Astrue*, No. 07-CV-4554 (NGG), 2009 WL 2386039, at *14 (E.D.N.Y. July 31, 2009) (stating that the Second Circuit holds the opinion that when there are conflicting opinions between treating and consulting sources, limited weight should be given to the consulting sources). As the Second Circuit has explained,

"'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (quoting *Torres v. Bowen*, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988)). In addition, consultative examinations often ignore subjective symptoms completely or give them only minimal consideration without stated reasons. *Harris*, 2009 WL 2386039, at *14.

An ALJ's failure to properly apply the treating physician rule is ground for remand. *Bailey*, 815 F. Supp. 2d at 598 ("The ALJ's failure to provide 'good reason' for not crediting the opinion of the plaintiff's treating source alone is ground for remand."). Here, the ALJ erroneously accorded substantial weight to one-time consulting or reviewing sources Govindaraj, Jackson, and Kessel, and incorrectly accorded little weight to long-term treating sources DeGennaro, Babus, and Rao. (*See* R. 737-40, 712-15, 717-36, 252, 320-80, 782-88.) Accordingly, the matter is remanded for further proceeding consistent with this opinion.

**Plaintiff's Remaining Arguments**

Plaintiff asserts that the ALJ improperly discredited her complaints of pain. (Pl. Mem. 17-19.) Plaintiff contends that because she has a medical impairment (fibromyalgia) that could reasonably be expected to produce the alleged pain, the Commissioner was required to evaluate the intensity, persistence, and functionally limiting effects of that pain. 20 C.F.R. § 404.1529(c)(1) (2011); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 349 (E.D.N.Y. 2010); Social Security Ruling ("SSR") 96-7p. Indeed, courts have found that because pain can be more severe "'than can be shown by objective medical evidence alone,' once a claimant has been found to have a pain-producing impairment, the Commissioner may not reject the claimant's statements about [her] pain solely because objective medical evidence does not substantiate those

statements." *Hilsdorf*, 724 F. Supp. 2d at 349-50 (quoting 20 C.F.R. § 404.1529(c)(2)-(3)). If subjective complaints of pain exceed what any objective testing may reveal, the ALJ must examine:

> (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating or aggravating factors; (4) type, dosage, effectiveness, and adverse side-effects of medication that the claimant has taken to alleviate her symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; and (6) any measures which the claimant uses or has used to relieve her pain or other symptoms.

*Harris*, 2009 WL 2386039, at *16; *see also Jackson*, 2010 WL 3777732, at *5 (reasoning that careful consideration must be given to information about symptoms because they can "sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone"). Here, the ALJ did not examine the foregoing factors, even though both DeGennaro and Babus diagnosed fibromyalgia – a disorder associated with widespread pain[2] – which bolsters Plaintiff's credibility as to her statements of pain. (*See* R. 807, 252, 323-25, 384, 134, 136.) On remand, the ALJ is directed to reconsider, consistent with this opinion, his finding that Plaintiff's allegations of pain are not credible because they are not supported by objective medical evidence.

The ALJ also improperly concluded that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her alleged symptoms were "not credible to the extent they are inconsistent with the . . . *residual functional capacity assessment*." (R. 14.) (emphasis added). This is an improper analysis because "it was counterintuitive to reject [plaintiff's] physical symptoms simply because they were at odds with the ALJ's RFC assessment; rather, they

---

[2] The Social Security Administration's diagnostic criteria for fibromyalgia consists of: (1) "[a] history of widespread pain…; (2) [r]epeated manifestations" of common symptoms such as "fatigue, cognitive or memory problems, … waking unrefreshed, depression, anxiety disorder, and irritable bowel syndrome; and (3) [e]vidence that other disorders that could cause these repeated manifestations of symptoms … were appropriately excluded." SSR 12-2p (effective July 25, 2012).

[should have been] assessed *in order to determine* her RFC." *Jackson*, 2010 WL 3777732, at *5 (emphasis in original).

In addition, Plaintiff alleges that the ALJ erred with respect to determining her RFC. (Pl. Mem. 19-21.) "An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities." *Hilsdorf*, 724 F. Supp. 2d at 347 (citing *Zorilla v. Chater*, 915 F. Supp. 662, 666-67 (S.D.N.Y. 1996)). Here, the ALJ relied on the consultative assessments of Govindaraj and Kessel, although their medical reports did not expressly address Plaintiff's work-related capabilities. (R. 717-34, 737-40) On remand, the ALJ is directed to determine Plaintiff's RFC in a manner consistent with this opinion.

## III.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted, the Commissioner's motion is denied, the Commissioner's decision is reversed, and the matter is remanded for further proceedings consistent with this opinion.

**SO ORDERED.**

_____S/_____
SANDRA L. TOWNES
United States District Judge

Dated: September 30, 2014
        Brooklyn, New York